Hearing:
December 16, 2009

THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
June 11, 2010
Bucher

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

National Pork Board and National Pork Producers Council

v.

Supreme Lobster and Seafood Company

————

Opposition No. 91166701
against Serial No. 76574162

————

Christopher P. Beall of Levine Sullivan Koch & Schulz, LLP
and John L. Beard of Faegre & Benson LLP for National
Pork Board, and David W. Grace of Loeb & Loeb LLP for
National Pork Producers Council.

Jennifer R. Quinn, Jennifer L. Zordani, Amy M. Gardner and
Ethan E. Trull of Ungaretti & Harris for Supreme Lobster
and Seafood Company.

————

Before Bucher, Grendel and Ritchie, Administrative
Trademark Judges.

Opinion by Bucher, Administrative Trademark Judge:

Supreme Lobster and Seafood Company seeks registration

on the Principal Register of the mark **THE OTHER RED MEAT**

*(in standard character format)* for "fresh and frozen salmon"

in International Class 29.[1]

---

[1]     Application Serial No. 78212909 was filed on February 4,
2004 based upon applicant's allegation of a *bona fide* intention
to use the mark in commerce.

Registration has been opposed by National Pork Board (NPB) and National Pork Producers Council (NPPC). As their grounds for opposition, opposers assert that (1) applicant's mark when used in connection with its goods so resembles opposers' previously used and registered marks, **THE OTHER WHITE MEAT** *(in standard character format)*, for "association services namely, promoting the interests of members of the pork industry" in International Class 42[2]; the "guitar pick" or "ham" design mark shown at right, registered for "promoting the interests of the members of the pork industry" in International Class 35, and "providing an Internet website featuring information about cooking and accompanying recipes" in International Class 43[3]; and **THE OTHER WHITE MEAT** *(in standard character format)*, for "cookbooks, brochures about pork, pens, pencils, crayons, bumper stickers, and stickers" in International Class 16; shirts, t-shirts, sweatshirts,



---

[2]    Registration No. 1486548 issued to National Pork Producers Council (NPPC) on April 26, 1988; assigned to National Pork Board on October 10, 2006, Assignment Records, Reel 3405/Frame 0030; renewed.

[3]    Registration No. 3126072 issued to National Pork Board on August 8, 2006; this application was originally filed by National Pork Producers Council (NPPC) on March 28, 2005.

aprons, jackets, and hats" in International Class 25, and

"providing an Internet website featuring food

preparation/cooking information regarding pork and

accompanying recipes" in International Class 43[4], as to be

likely to cause confusion, to cause mistake or to deceive

under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d);

and that (2) registration of applicant's mark will result

in a likelihood of dilution under Section 43(c) of the Act,

15 U.S.C. § 1125(c).

Applicant, in its answer, has denied the essential

allegations in the opposition.

Based upon the extensive evidence in this record, and

for reasons discussed at length below, we sustain the

opposition on the basis of a likelihood of dilution, and

choose not to make a determination as to opposers' claim of

likelihood of confusion.

## *Preliminary matters*

### *Opposers' articles reflecting public recognition of the involved slogan*

Applicant has objected to our consideration of

Internet websites submitted through opposers' Second Notice

---

[4]     Registration No. 3129186 issued to National Pork Board
(NPB) on August 15, 2006; this application was originally filed
by National Pork Producers Council (NPPC) on June 10, 2005.

of Reliance on the grounds that they are irrelevant and are "unreliable." We overrule this objection.

As to their relevance, the public's perception of opposers' mark is very much at issue in this case. Articles downloaded from the Internet are evidence of consumer perceptions. *In re Bayer Aktiengesellschaft,* 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007). As to the admissibility of Internet documents generally, in a case decided since applicant filed its trial brief, we held as follows:

> [I]f a document obtained from the Internet identifies its date of publication or date that it was accessed and printed, and its source (e.g., the URL), it may be admitted into evidence pursuant to a notice of reliance in the same manner as a printed publication in general circulation in accordance with Trademark Rule 2.122(e).

*Safer, Inc. v. OMS Investments, Inc.*, Opposition No. 91176445 at 18-19 (TTAB, February 23, 2009).

To the extent applicant has singled out the unreliable nature of uncorroborated information opposers may have drawn from "wiki-type" websites, we have considered this argument in determining the probative value of such evidence. *In re IP Carrier Consulting Group*, 84 USPQ2d 1028, 1032 (TTAB 2007). By contrast, an electronically-generated document which is the equivalent of the printed

form of a publication or official record is treated the same as the printed publication or official record under Rule 2.122(e). *See Weyerhaeuser v. Katz*, 24 USPQ2d 1230, 1232 (TTAB 1992); and TBMP § 704.08 (2d ed. rev. 2004).[5]

### The testimony of Becca Hendricks and accompanying evidence of tracking studies

Applicant has objected to the testimony of Becca Hendricks and exhibits regarding almost twenty years of opposers' annual tracking surveys submitted as exhibits to that testimony, on the ground that Ms. Hendricks is unqualified to offer expert testimony, that she failed to demonstrate the reliability of these studies, and her testimony will not assist the trier of fact.

It should be noted that these year-to-year tracking studies of consumers' perceptions of opposers' promotional campaigns were performed long before this litigation arose. Ms. Hendricks, Mr. Meimann and Dallas Hockman, NPB's former vice president for demand enhancement, all testified that these tracking studies were NPB's regularly-kept business records that opposers actually relied upon for measuring the benefits and performance of their advertising programs,

---

[5] We note that opposer has introduced these publications to show only the fact that the involved marks appear within the publications, and there is, therefore, no hearsay problem.

managing and planning their programs, communicating the benefits of promotional campaigns back to key stakeholders, and even for purposes of governmental oversight. [Hendricks at 21-22, 102-103; Hockman at 21-24; and Meimann at 51-56] Under the Federal Rules of Evidence, Rule 803(6), we fully credit the testimony of Ms. Hendricks as we find that she was the appropriate custodian of opposers' records relating to these studies because she was the person responsible for working directly with the firms that performed the surveys. Opposers never put her forward as an expert witness having specialized expertise on the intricacies of the survey methods. Therefore, we have considered the business records that opposers have submitted and the testimony of Ms. Hendricks to the extent that she testified to events occurring during her employment with opposers, and on matters about which she had direct, personal knowledge.[6]

---

[6] Moreover, Ms. Hendricks provided sufficient foundational testimony to show that to the extent she may not have had first-hand knowledge of opposers' business records outside her tenure, she testified that she had learned about the history of the tracking studies, had reviewed underlying documents and spoke with other employees who had been with opposers prior to her tenure. We find that she was sufficiently competent and trustworthy to testify on the issues before her, and applicant has presented no evidence that her testimony was untruthful or unreliable. *See Crash Dummy Movie LLC v. Mattel Inc.*, 601 F.3d 1387, 94 USPQ2d 1315, 1317 (Fed. Cir. 2010).

As to the probative value of these tracking studies, each of these lengthy reports produced by the consulting firms that conducted the studies contains extensive information concerning the methodology of the survey, the survey questionnaire used, and information on the demographics of the respondents questioned.  [See Ex. 274a and Hendricks at 62-65].  We find these studies probative to the extent that they corroborate the results of the later "Northwestern Study" and Klein Dilution Survey, both of which we do subject to the rigors of the *Daubert* test. *See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 27 USPQ2d 1200 (1993).*

### *Applicant's articles discussing USDA's alleged failures to prevent tainted meats from going to market*

NPB has objected to more than two-hundred printed publications attached to applicant's First Notice of Reliance and Exhibits 1 through 7 of applicant's Sixth Notice of Reliance on the grounds that they are irrelevant to the issues involved herein and also that they constitute inadmissible hearsay with respect to the truth of the matters contained therein.

As to their relevance, we agree with opposers that these articles are irrelevant because none of the articles makes any reference to either of the opposers or to the

- 7 -

public's perception of opposers' mark, **THE OTHER WHITE MEAT**, which is the issue in this case. The bulk of these stories are irrelevant because they deal with beef, not pork. Additionally, we give these printed publications no consideration because NPB's control over the quality of pork products sold by its licensees is not a relevant issue in this case. NPB has no obligation to control the quality of pork sold by licensees who make use of NPB's promotional slogan. Rather, the focus is on the quality control that NPB maintains over its licensees' promotional activities when they use the slogan, **THE OTHER WHITE MEAT**. [Meimann at 75-78; Hendricks at 10-11; Ex. 262][7]

As to opposers' hearsay objection, these hundreds of printed publications cannot be admitted for the truth of the matters described in the materials (e.g., applicant's attempt to show that USDA has failed to keep tainted meats off the market). *In re Omaha Nat'l Corp*, 819 F.2d 1117, 2 USPQ2d 1859, 1860 (Fed. Cir. 1987) [copies of newspaper articles may be used only to show descriptive use of the term at issue]; *Gravel Cologne, Inc. v. Lawrence Palmer,*

---

[7] To the extent that these publications are being offered to support applicant's theory of "naked licensing" by NPB, we have already held that they will not be considered in this proceeding. *See* our Order of September 29, 2008 on applicant's motion to amend.

*Inc.*, 469 F2d 1369, 176 USPQ 123, 123 (CCPA 1972) [printed publication offered for the truth of the matters contained therein is inadmissible hearsay]; *Harjo v. Pro-Football Inc.*, 50 USPQ2d 1705, 1721 n50 (TTAB 1999), *rev'd on other grounds*, 284 F.Supp.2d 96, 98 USPQ2d 1225 (D.D.C. 2003); *Logicon, Inc. v. Logisticon, Inc.*, 205 USPQ 767, 768 n6 (TTAB 1980) [copy of a magazine article is admissible only for what it shows on its face and not the truth of the matters described therein].

Accordingly, we have given no consideration to applicant's First Notice of Reliance, with its attached exhibits, or Exhibits 1 through 7 of applicant's Sixth Notice of Reliance.[8]

## *Third-party usage of* THE OTHER WHITE MEAT

Applicant alleges that opposers have not adequately monitored the use of their slogan, "The Other White Meat." As one demonstration of this, applicant has submitted testimony from Roy Sharp as well as a certified copy of the following mark [Registration No. 1644516 issued to Roy

---

[8]   We note further, in response to applicant's continuing arguments, that opposers' objections to these publications are rooted in questions of relevance and hearsay objections, not the fact that the copies of the publications are drawn from "electronic sources" rather than from more traditional "printed" publications.

Sharp, Inc. on May 14, 1991], containing the slogan

opposers claim as theirs, namely, "The Other White Meat,"

registered in connection with "processed and packaged

pork":



[9]

We have not considered this registration inasmuch as

it was cancelled under Sec. 8 of the Trademark Act in

November 1997, and a cancelled registration has no

evidentiary value as to the scope of protection to be

afforded to opposers' claimed marks. *See Action Temporary*

*Services Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d

1307, 1309 (Fed. Cir. 1989) ["a cancelled registration does

not provide constructive notice of anything"].

Moreover, we agree with opposers that to consider Roy

Sharp's testimony and accompanying exhibits as part of this

record, would result in consideration of a collateral

---

[9]    In the application which resulted in that registration, the applicant made no claim to the right to use the words "California Fresh," "Pork," "The Other White Meat" and "All Natural" apart from the mark as shown.

attack on the validity of NPB's service mark registrations – an attack that we have already rejected in our Order of September 29, 2008.[10]

Similarly, as to use of this slogan by state and regional pork producer associations, opposers have clarified that pursuant to the Pork Act, this slogan is promoted through advertising purchased by these related industry organizations that also receive up to twenty percent of the total Pork Checkoff[11] funds each year. [Meimann at 14-15, 66-68; Williams-I at 62-63, 113-114; Hockman at 82-85]  All of the marketing activities that display the mark **THE OTHER WHITE MEAT** are supervised by NPB. [Meimann at 15, 64-66; Exs. 57, 58, 59, 60, 296 at 10]  In fact, this testimony actually supports a finding of the

---

[10]    Given that this testimony and evidence is irrelevant and inadmissible, we do not need to discuss the limited probative value this material would have even if it were relevant and admissible.  We note that (i) the record contains no indication that opposers even knew of this label; (ii) Mr. Sharp served as a former member of both of opposers' boards, and continued to be supportive of both; (iii) he voluntarily disclaimed the term; (iv) his label used the informal trademark notification symbol (™) to identify the slogan then as being NPPC's mark, and finally; (v) his testimony was vague about how extensively this label was actually used in the early 1990's.  [Sharp at 47-56, Ex. 402 and 403]

[11]    This is an assessment designed to promote the consumption of pork and pork products in the United States derived from a fee on all hogs sold in the United States.  More discussion of this funding in the text of the opinion *infra* under the heading "Opposers."

enhanced goodwill and subsequent renown of the mark used by opposers, rather than detracting in any way from the value of the repeated and consistent exposure of opposers' slogan.

Accordingly, we find no compelling evidence in the record of third-party usage of this term in a manner that suggests opposers were anything but vigilant in policing their exclusive rights in this slogan.

### *Testimony and evidence about "Northwestern Study" and Klein Dilution Survey*

Applicant has also asked that we bar from the record the results of two separate surveys and the supporting testimony of Dr. Anders Gronstedt and Dr. Robert Klein. However, we find this evidence and expert testimony to be relevant and reliable, and therefore it meets the threshold of Rule 702 of the Federal Rules of Evidence and the framework set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* To the extent applicant's claims of unreliability go to the alleged weaknesses in the survey design, implementation or subsequent analysis, it does not go to its admissibility but to its weight – an important topic we will discuss *infra* at 27-36.

### *The Record*

In addition to the pleadings, the file of opposed application Serial No. 76574162 [the '162 application] is part of the record without any action by the parties. Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b). Additionally, opposers introduced the following evidence:

(i)  Opposers' notices of reliance on (a) printed publications showing third-party references to, and public awareness of, the mark **THE OTHER WHITE MEAT;** (b) copies showing status and title of opposers' claimed registrations; (c) copies showing status and title of opposers' registrations for marks such as **THE OTHER BURGER**[12] *(in standard character format)* and **THE OTHER TAILGATE PARTY**[13] *(in standard character format);*

(d) Rebuttal designation of portions of the discovery deposition of Neil Dierks, chief executive officer of

---

[12]   Registration No. 2009023 issued for "association services, namely promoting the interests of members of the pork industry" to National Pork Board (NPB) on October 15, 1996; this application was originally filed by National Pork Producers Council (NPPC) on October 6, 1994; renewed.  No claim is made to the exclusive right to use the term "Burger" apart from the mark as shown.

[13]   Registration No. 2840618 for "association services, namely, promoting the interests of members of the pork industry" issued to National Pork Board (NPB) on May 11, 2004; this application was originally filed by National Pork Producers Council (NPPC) on August 8, 2000.

NPPC[14]; and (e) Rebuttal designation of portions of the discovery deposition of Steven Meyer, of Paragon Economics, formerly a staff economist with NPB.

(ii) Opposers' testimonial depositions with exhibits: (a) Mark Williams (February 4, 5 and 29, 2008), of The Motus Group, and formerly account executive with NPB's advertising firm responsible for **THE OTHER WHITE MEAT** campaign; (b) James Meimann (February 27, 2008), senior vice president of governance and operations with NPB; (c) Steve Murphy (February 28, 2008), chief executive officer of NPB; (d) Dallas Hockman (February 26, 2008), vice president of industry relations with NPPC, and formerly vice president of demand enhancement with NPB; (e) Jeff Hartz (February 11, 2008), formerly director of brand strategy with NPB; (f) Jarrod Sutton (February 12 and March 12, 2008), director of retail marketing with NPB; (g) Ceci Snyder (February 11, 2008), assistant vice president of consumer marketing; (h) Larry Cizek (February 12, 2008), director of culinary niche marketing; (i) Stephanie Empey (February 12, 2008), senior web

---

[14] Applicant submitted a stipulation by the parties to allow the deposition testimony to be submitted pursuant to Trademark Rule §2.120(j)(2).

developer with NPB; (j) Becca Hendricks (March 12, 2008), formerly strategic marketing manager with NPB; (k) Toni O'Malley (March 13, 2008), director of service center with NPB; (l) the adverse party deposition, in its entirety, of Dominic Stramaglia (February 4, 2008), owner, chief executive officer, and president of applicant, Supreme Lobster and Seafood Company; (m) Anders Groenstedt, Ph.D. (March 13, 2008), president of The Groenstedt Group, and principal investigator and author of "The Northwestern Study" of 2000 conducted under the auspices of the School of Integrated Marketing & Communications at Northwestern University and its Professor Clarke Caywood, regarding well-known advertising slogans; (n) Robert Klein (February 28, 2008), president of Applied Marketing Science, Inc., a retained expert regarding a consumer survey conducted on behalf of opposers in support of their position in this litigation.

Applicant introduced into the record the following evidence:

(i)     designation of excerpts of the discovery deposition of Steven Meyer, Paragon Economics, formerly a staff economist with NPB, taken on August 17, 2007;

(ii)   printed publications offered to show the lack of relevance, reliability, foundation or appropriate procedures for opposers' survey evidence; and

(iii)  designation of excerpts of the discovery deposition of Neil Dierks, chief executive officer of NPPC taken on March 14, 2007.

## *Factual Findings*

### *Applicant*

According to Dominic Stramaglia, a founder and now CEO of applicant, Supreme Lobster and Seafood Company is a wholesale seafood distributor headquartered in Chicago that sells, *inter alia*, fresh and frozen salmon to retailers and food service providers (e.g., supermarkets and restaurants). [Stramaglia at 5-7, 10-12 and 15] Mr. Stramaglia testified that he thought of **THE OTHER RED MEAT** as a trademark for salmon in order to exemplify all of the good, healthy and nutritious things that salmon provides to consumers. [Stramaglia at 33—34] The trademark search that Mr. Stramaglia received, when clearing **THE OTHER RED MEAT** as applicant's prospective mark, included within the results a summary of opposers' claimed service mark herein, namely **THE OTHER WHITE MEAT**. The '162 application is an

intent-to-use application with no evidence in the record showing any use of the mark to date.  [Stramaglia at 18-19]

### *Opposers*

The applications underlying all three of opposers' cited registrations were originally filed by NPPC.  For years the NPPC had collected monies from its members, but fewer than half of NPPC's members had paid contributions on a voluntary basis.  [Meimann at 10]  Plagued with the problem of so many free-riders while feeling the need for sufficient resources to fund expensive media advertising, the NPPC lobbied for federal legislative authority forcing mandatory checkoff contributions.  *Id*. at 8-12 Accordingly, the National Pork Board [NPB] was formed as an instrumentality of the U.S. government in 1986 when Congress passed the Pork Promotion, Research, and Consumer Information Act of 1985 (the "Pork Act").  [Meimann at 8-10; Ex. 18 at Bates No. NPB3623]  With the passage of the Pork Act and the attendant regulations, NPB began collecting a "Pork Checkoff assessment," essentially a fee on all hogs sold in the United States.  *Id.*  The revenues collected from this assessment are designed to promote the consumption of pork and pork products in the United States. [Meimann at 9-10, 16-17]  A January 2001 settlement

agreement changed the relationship between NPB and the NPPC.  Rather than providing grants to NPPC, as its general contractor, NPB was required to implement the check off program with its own staff.  [Meimann at 23-27] Accordingly, in July 2001, employees of the NPPC who implemented the Pork Checkoff program became employees of the NPB.  [Meimann at 23-27]  After resolution of checkoff-related litigation in 2006, NPPC transferred the mark **THE OTHER WHITE MEAT** to NPB.  [Meimann at 50][15]

Between 1987 and 2007, this assessment on the hog industry generated almost $1 billion in fees.  [Meimann at 61-62; Ex. 297]  Over this period of two decades, NPB has spent more than $500 million dollars on "demand enhancement"[16] activities to market pork products to U.S.

---

[15]    Both NPB and NPPC are correctly joined in this proceeding as "opposers."  Although NPPC originally owned the claimed marks, NPB, the current owner of the involved marks, has taken the lead in this litigation in recent years.  Given the various changes over time, there may well be examples in this written decision when the individual designation "NPB" would be an appropriate replacement for the collective "opposers."

[16]    As used throughout this decision, "Demand Enhancement" activities involve the use of advertising and promotional themes designed to support the economic welfare of producers of particular agricultural commodities.  Often adopting a catchy slogan, commodity boards initiate nationwide promotional campaigns to increase the demand for their agricultural products. These costly advertising efforts are often funded by commodity "checkoff" programs –– value assessment fees on commodity sales by producers or others in the marketing chain.

consumers. [Meimann at 62; Williams-III at 275; Ex. 298] Most of this promotion has included a display and or verbal expressions of the slogan **THE OTHER WHITE MEAT**. [Williams-III at 273-274]

Prior to the formation of the NPB, the slogan **THE OTHER WHITE MEAT**, along with an attendant proposal for a national advertising campaign, was developed by The Bozell advertising firm (under the direction of Bozell account executive, Mark Williams) working under contract with the NPPC. [Meimann at 19-21; Williams-I at 10-21] In the fall of 1986, Mr. Williams presented the proposal to NPB to commence its congressionally-mandated pork promotional activities. [Williams-I at 24-26] NPB's newly-constituted board approved the advertising campaign, and early in 1987, the ads featuring the new mark **THE OTHER WHITE MEAT** were launched nationwide. [Meimann at 19-22; Williams-I at 26] The advertising campaign to benefit the pork industry was funded by Pork Checkoff dollars from NPB, then under the administration of NPPC as NPB's general contractor. [Meiman at 17-19]

From the beginning, the national advertising campaign stressed that chicken and fish are not the only choices for a reduced-fat, balanced diet. The thrust of opposers' campaign was to create a positive effect on consumer

attitudes about pork in the face of growing concerns about the health risks of eating red meat.  Opposers' national print advertisements have for years stressed pork's nutritional benefits as well as its convenience.  The advertising campaign for **THE OTHER WHITE MEAT** has also been waged on radio, television, billboards, taxi cabs and transit shelters [Exs. 121, 211, 213].  Opposers note that the initial launch of this slogan and the results of the first few years of the promotion were so impressive that the Harvard Business School used it for years as a case study, with students evaluating how effectively this campaign, relying upon the distinctiveness of this slogan, translated into significantly increased sales for the pork industry.  [Williams-I at 37-38; Ex. 65]

    As an example of added synergy, both retailers and food manufacturers have participated with opposers in co-branded advertising campaigns that promote the mark **THE OTHER WHITE MEAT** in conjunction with their own products and/or services.  The examples include  Campbell's food products, Miller Lite beer/Kraft food products and Kendall-Jackson wines.  [Williams-I at 114-116; Ex. 212 at Bates No. NPB075317]  This is in addition

to the regular and frequent advertising of the mark **THE OTHER WHITE MEAT** by supermarkets in their regular weekly newspaper circulars. While opposers have worked very closely with the supermarkets on these supermarket flyers, they have never had to pay for this exposure. [Sutton-I at 38-54] It is on these exemplars that the record shows advertisements consistently portray images of the mark **THE OTHER WHITE MEAT** on packages of fresh pork displayed on the same page as, or even directly adjacent to, photos of packages of salmon. [Ex. 224 at Bates No. NPB13583; Ex. 225 at Bates No. NPB13563; Ex. 226 at Bates No. NPB13655; Ex. 227 at Bates No. NPB13767; Ex. 228 at Bates No. NPB14045; Ex. 229 at Bates No. NPB14144; Ex. 230 at Bates No. NPB14168; Ex. 232 at Bates No. NPB14513, Ex. 233 at Bates No. NPB15071; Ex. 234 at Bates No. NPB15081; Ex. 235 at Bates No. NPB15119; Ex. 274 at Bates No. NPB075023-24; Ex. 276; see also Sutton-I at 52-53]

Opposers' cooperation with supermarkets also included a variety of in-store promotional programs such as floor displays, recipe cards, and promotional banners. [Sutton-I at 62-67, 79; Exs. 136, 141, 142] Opposers also distributed meat package labeling that allowed retailers to display the mark, **THE OTHER WHITE MEAT** – often combined with nutritional and recipe information. [Sutton-I at 31-32,

71-73; Hockman at 69-72; Exs. 147, 174 at Bates No. NPB75022]

The mark is also promoted through advertising purchased by state pork producer associations that receive a portion of each year's total Pork Checkoff assessment funds.  Thus, in addition to the $500 million in demand enhancement activity that opposers have funded from 1987 to 2007, as much as an additional $50 million in promotional and marketing activities by the state associations (but supervised by NPB) has also enhanced the exposure of the mark **THE OTHER WHITE MEAT**.  [Meimann at 14-15, 64-68; Williams-I at 62-63, 113-114; Hockman at 82-85; Exs. 57, 58, 59, 60 and 296 at 10]

Opposers have also scored public relations points through "earned media" activities designed to promote the pork industry under the mark **THE OTHER WHITE MEAT**, using celebrity spokespersons such as Peggy Fleming, Joan Lunden and Chicago's well-known Coach Mike Ditka, and by sponsoring race cars.  Opposers' culinary marketing program garnered widespread news coverage through its "Celebrated Chefs" program and an annual "National Eat Dinner Together Week."  Opposers promote the interests of the pork industry through numerous websites, some of which display the mark **THE OTHER WHITE MEAT** on every page of the site.  [Empey at

8-10; 21-22; Ex. 266; http://www.pork.org/, http://www.porkandhealth.org/, www.porkfoodservice.com, http://www.porkfoodservice.org/, www.porkstore.com, www.otherwhitemeat.com, www.pork4kids.com, www.nichepork.com, etc.] During the month of July 2007, the dominant website, www.theotherwhitemeat.com, received almost a hundred thousand daily, unique visitors, with a total of almost six hundred thousand page views. [Empey at 19, 27; Ex. 175 at Bates No. NPB075095 and NPB075102] The highest volume traffic goes to opposers' web pages having recipes – an informational service that has proven to be most popular. [Empey at 40] Opposers' promotional efforts include the sale and distribution of collateral merchandise (e.g., shirts, jackets and other apparel, recipe books, cooking utensils, cooking ingredients, etc.) bearing the mark **THE OTHER WHITE MEAT**, including sales from opposers' "Pork Store" website, at www.porkstore.com. [O'Malley at 8-17; Ex. 340]

Finally, opposers have tried to broaden the scope of their brand in the mark **THE OTHER WHITE MEAT** by launching advertising campaigns that have stressed the phrase "The Other _____." For example, opposers regularly run advertising featuring marks such as **THE OTHER BURGER** and

**THE OTHER TAILGATE PARTY**[17] in close association with the mark **THE OTHER WHITE MEAT**. [Williams-I at 69-72; Hockman at 200; Sutton-I at 43-44; Exs. 22, 151, 218, 219]



Similarly, opposers have run local and national advertising playing off the mark with tag-lines that read "The Other Backyard Barbecue," "The Other Stir-Fry," "The Other Romantic Dinner," "The Other Sunday Brunch," "The Other TV Dinner," "The Other Way to Spice Up Your Love Life," "The Other Steak Dinner," "The Other Prime Rib," and "The Other White Protein." [Williams-I at 86-92; Exs. 94, 95, 113] In each case, these alternative slogans were always displayed in close conjunction with the central brand, **THE OTHER WHITE MEAT**, in an attempt to establish a close consumer perception around the phrase "The Other _____" in connection with promotion of the pork industry. [Meimann 188-189; Williams-I at 86-92; Hockman at 201-203; Exs. 93, 94, 95, 113, 151, 218, 219, 247, 254] Even with the introduction of other popular taglines like "Taste

---

[17] As noted earlier, these registered have been made of record. [Exs. 292 and 293.], but opposers have not pleaded likelihood of confusion with respect to any of these other marks, nor have they pleaded a family of "THE OTHER _____" marks.

What's Next" and " … Now the meat of the millennium," the central focus remained on the slogan, **THE OTHER WHITE MEAT**.

As part of its regular monitoring of its demand enhancement activities, as well as to comply with its obligation to report on such activities to the Agricultural Marketing Service of the USDA, opposers have since 1987 conducted semi-annual tracking surveys through independent research firms. [Williams-I at 84, 127-130; Williams-II at 193-195; Williams-III at 255-265; Hendricks at 9-10, 46-103; Hockman at 13-17, 20-26; Exs. 274, 274a, 274b, 274c, 274d, 274g, 274i, 274k] These tracking study results have been critical to the planning of opposers' annual advertising and promotional strategies and other business activities. [Williams-III at 264; Hockman at 19] In response to the admittedly leading question "Have you read, seen or heard pork referred to as 'The Other White Meat?'," these tracking studies have consistently shown public awareness of the mark **THE OTHER WHITE MEAT** at or above eighty-five percent of consumers nationwide. [Ex. 77 at Bates No. NPB67080; Hockman at 214-217; Williams-I at 130-133; Hendricks at 51-56]

In a separate study in the year 2000 ("the Northwestern Study"), conducted under the auspices of the School of Integrated Marketing & Communications at

Northwestern University and its Professor Clarke Caywood, researchers found that the mark **THE OTHER WHITE MARK** was the fifth most recognized advertising slogan in America among the general adult population at that time.

In 2005, after internal review and study, opposers decided to keep "The Other White Meat" as the core of the brand, but in order to make the brand image a bit more  fresh, hip, cool and contemporary, added the tagline, "Don't be blah."[18] In the words of one witness, with the passage of time and stagnant sales of pork, the goal was to take the brand from John Wayne to Tom Hanks. [Hartz at 17-28]

Finally, in connection with this litigation, NPB engaged marketing research expert Robert Klein to conduct a survey testing the likelihood of dilution caused by applicant's intended mark. [Klein at 26-46] This research purported to show that more than thirty-five percent of the respondents, in response to an unaided question, associated applicant's slogan with NPB's slogan or the pork products it promotes. [Klein at 64-66; Ex. 317]

---

[18] Dierks at 155-156, Ex. 8, Bates No. NPB067609.

## *Survey Evidence*

Inasmuch as opposers and applicant have spent a great deal of time supporting and attacking, respectively, a pre-litigation study and a litigation survey, we will discuss in detail the specifics of whether the results are probative to our determination herein.

### ***Northwestern Study of 2000***

As noted above, applicant objects strongly to opposers' submission of a study conducted in the year 2000 by outside academics at the School of Integrated Marketing & Communications at Northwestern University (the "Northwestern Study"). Applicant argues that this study should be excluded inasmuch as the working papers for the survey were inadvertently disposed of during an office move well before this litigation arose, because the methodology for the survey was flawed, and because the time frame of the survey allegedly renders it irrelevant and prejudicial. We disagree.

The loss of pre-litigation working papers (during an office move) is not especially prejudicial to applicant. During his discovery deposition [Ex. 339], Dr. Groenstedt provided applicant with exhaustive information about the methodology, analysis and conclusions of the study. In his

trial testimony, again he provided extensive and specific testimony concerning all the information that would have been available in the working papers. [Groenstedt at 20-112]

The Northwestern Study was made up of three phases: (1) compiling a list of 114 commercial slogans; (2) winnowing this list down to the 25 most recognized slogans; and (3) conducting a telephone survey with more than a thousand telephone respondents to determine the degree of recognition of each slogan.

We turn then to the first questioned methodology of this study, namely, the narrowing of the slogans in the second phase of the study. Opposers argue that this is a commonly used "convenience survey," used in this case to reduce the universe of 114 slogans down to a more manageable set of twenty-five to be used in a telephone survey [Groenstedt at 25-27]. This seems quite reasonable, especially in the absence of any evidence suggesting that there were similar, famous slogans that should have been part of the test but were left off the list of the twenty-five best-known slogans to be tested. Applicant's Internet pages about the success of other advertising slogans (e.g., of McDonalds, 7-Up, Ace Hardware, Charmin and Ford Motor Company) suggest that even if another study may well have

settled on a slightly different set of slogans in naming the top twenty-five consumer advertising slogans, such subjectivity alone does not invalidate the Northwestern Study.  We note that among these twenty-five competing slogans were ten involving food and beverage items (e.g., "Snap, Crackle, Pop," "The Breakfast of Champions," "The King of Beers," "The Un-Cola," "Got Milk?," "They're Great," "How America Spells Cheese," "Did Someone say McDonalds?," and "The Soup that Eats Like a Meal.").

Moreover, during the last phase of the study (when twenty-five slogans were tested in more than a thousand telephone interviews), the research was conducted by a well-regarded market research firm according to generally accepted survey procedures.  The specific research goal was that of assessing the strength of **THE OTHER WHITE MEAT** in comparison with other well-known slogans.  Respondents were asked whether they recognized a slogan and whether they could correctly attribute it to a brand, product or industry.  [Groenstedt at 22, 35-39, 99, 111][19]

---

[19]    The interviewer read each respondent a list of twenty-five advertising slogans.  For each of the slogans, the respondent was asked if he/she recognized the slogan.  If he/she responded affirmatively, the follow up question was to what brand, product or industry he/she attributed the slogan.  Groenstedt discovery deposition at 65; Groenstedt at 37.

Applicant attacks the aided awareness questioning used during the telephone survey.  However, the methodology of this study did not lead respondents to a desired result by using inherently suggestive questions.  The attribution questions did not invite guessing but relied upon the respondents being able to make the correct association.  In assessing the proper evidentiary weight to be accorded to this evidence and testimony, we find the results to be probative of the public perceptions, and hence the renown, of opposers' claimed slogan.

Finally, inasmuch as one of the elements that opposers must prove under the likelihood of dilution claim is whether the mark **THE OTHER WHITE MEAT** became famous prior to the 2004 filing date of applicant's involved application, the Northwestern Study of 2000 is timely evidence to address this critical question.

### *Klein Dilution Survey of 2007*

Applicant also attacked the 2007 Dilution Survey prepared by Robert Klein (of Applied Marketing Science, Inc.) for use in this litigation [Klein at 26-27] because it allegedly used improperly-leading questions, an overly-broad universe of survey respondents, an inappropriate

control question, and failed to replicate market conditions.

After playing a recording of applicant's slogan, the screener asked the respondents the following questions:

(4)     "Thinking about the slogan you just heard [**THE OTHER RED MEAT**], do any other advertising slogans or phrases come to mind?"  [If answered "yes" continue to Q5]

(5)     "What *other* advertising slogan or phrase comes to mind?[20]

Applicant charges that Question 4 is inappropriate "because it improperly suggests to survey respondents that another slogan or phrase exists that should be brought to mind" upon hearing applicant's slogan.  However, the survey was intended to test the precise question of whether applicant's mark calls to mind opposers' mark or advertising campaigns.  Accordingly, it seems that it was necessary to pose the question of whether this slogan brought to mind any other advertising slogans.  We do not find this to an inappropriately leading question.  An affirmative answer of another slogan is not presumed with the phrasing of "… do any other advertising slogans … "

---

[20]     Ex. 314 at 2.

come to mind.  We note that at no point in the survey did the screener ever mention opposers' mark or product. *Contra Ralston Purina Company v. The Quaker Oats Company*, 169 USPQ 508, 509 (TTAB 1971) ["… [Q]uestions preceding the one here relied upon by opposer mentioned a number of times opposer's product by trademark.  The persistency thereof would necessarily condition the responses of the interviewees."].  *See also* 6 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §32.172 "Test of properly conducted survey – Slanted or leading questions – Avoiding Leading Questions" (4th ed. 2010).  Applicant may well have had reason to complain if screeners had led with a question like "Does the slogan you just heard call to mind any other slogans for products other than red meat."  However, as noted by opposers, applicant has not put forward an alternative way in which to ask the question that reaches the legitimate goals of the opposers while avoiding any purported suggestiveness.

As to the follow-on query contained in survey Question 5, applicant argues that intentional trickery was involved here.  According to applicant, by asking respondents to identify some "*other* advertising slogan" that may come to mind, Mr. Klein intended to introduce a critical word-association.  By instructing the survey interviewers to

stress the word "*other*" in "*other* advertising slogan,"
applicant argues that screeners allegedly induced the
response "The *Other* White Meat."  In this context, it is
difficult to avoid this word, coincidentally contained in
both parties' marks.  In fact, the survey design and
results actually demonstrate that Question 5 was not at all
suggestive in the direction that applicant complains.  The
survey respondents who indicated that the slogan **THE OTHER
RED MEAT** called to mind the mark **THE OTHER WHITE MEAT** had
first responded "yes" in response to Question 4, and merely
specified the slogan that came to mind in response to
Question 5.  [Ex. 318 at 1-54]  Furthermore, although
Professor McCarthy may question the relevance of a "call to
mind" question as it relates to issues of actual confusion
or likelihood of confusion, the phraseology of this
question is clearly relevant to the issue of likelihood of
*dilution*.  6 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR
COMPETITION, § 32.176 (4th ed. 2010).

Applicant argues that these survey results should be
barred from consideration, citing to case law and the MANUAL
FOR COMPLEX LITIGATION.[21]  However, court opinions,[22] including

---

[21]    Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION, § 11.493
at 102-104 (4th ed. 2004).

some of the same cases cited by applicant, as well as a leading commentator cited repeatedly by applicant, have confirmed that association queries are appropriate in light of the specific language of the current dilution provisions of the Lanham Act.[23] Moreover, we find that the questions posed were clear and not leading. The survey was conducted by qualified persons following proper interview procedures, and in a manner that ensured objectivity.

As to Mr. Klein's qualifying question of whether the respondents *had purchased* "seafood or fish" in the past, as opposed to whether the respondents *intended to purchase* "salmon" in the future, we fail to see any meaningful difference. Applicant has not shown that salmon eaters are

---

[22] *See James Burrough Limited v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 192 USPQ 555, 564 (7th Cir. 1976); *Anheuser-Busch. Inc. v. Balducci Publications*, 28 F.3d 769, 31 USPQ2d 1296 (8th Cir. 1994); *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 31 USPQ2d 1811, 1816 (7th Cir. 1994); *Pebble Beach Co. v. Tour 18 I. Ltd.*, 155 F.3d 526, 48 USPQ2d 1065, 1076-77 (5th Cir. 1998); *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 215 USPQ 175, 181-83 (W.D.Wash. 1982); and *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1 USPQ2d 1761 (S.D.NY 1986).

[23] *See e.g.,* 4 J. Thomas McCarthy, MᴄCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:116 (4th ed. 2010). Professor McCarthy confirms that "[a] survey asking what the accused mark brings to mind is evidence of the 'association' required by the statute." *See also Nike Inc. v. Nikepal International Inc.*, 84 USPQ2d 1820, 1825 (E.D. Cal. 2007) ["Mr. Johnson [a survey expert] testified that his survey revealed that the vast majority of respondents, 87%, associated **NIKEPAL** with **NIKE**; that is, when they encounter the mark **NIKEPAL**, they think of **NIKE** and/or its offerings."]

so limited in their fish or seafood choices that they would require a separate category.  A past purchaser of "seafood or fish" is a potential future consumer of "salmon."  The latter is a significant subset of the former, and in this particular situation any further narrowing of the potential universe would not result in any appreciable difference in the survey results.  This is certainly not an example of "a wholly irrelevant universe of respondents."  [Applicant's evidentiary objections at 26]  Any ambiguity about which channels of trade were included in the qualifying questions is also not of major concern to us inasmuch as there are no restrictions on applicant's intended channels of trade in the involved application.  *See Boston Red Sox Baseball Club Ltd. P'ship v. Sherman*, 88 USPQ2d 1581, 1591 (TTAB 2008).

Applicant's criticism of opposers' use of "The Tasty Main Dish" as an allegedly inappropriate control slogan, like other of applicant's complaints about the Klein survey, comes without a convincing explanation about what is inherently wrong with this particular phrase.  If the proof is in the pudding, opposers' survey results demonstrate that this control phrase did exactly what it was designed to do, namely, to assess the level of any guessing (or "noise") on the part of respondents that could

- 35 -

affect the reliability of the critical results of the survey.

Finally, we note that the involved mark is an intent-to-use slogan with virtually no actual presence in the marketplace. Opposers' use of a well-designed telephone survey in this context appears to us totally appropriate. Applicant's adopted mark has not yet been used in commerce, and applicant could well choose to present the slogan visually in a myriad of ways, so there is no particular significance to visual stimuli in the case at hand.

Hence, we overrule applicant's objections to Mr. Klein's testimony and his dilution survey prepared for this litigation. We find Mr. Klein's testimony to be reliable and persuasive, and the results of the survey to be probative on the issue of likelihood of dilution.

### *Standing*

As a preliminary matter, we find that opposers have established their standing – National Pork Board [NPB] by demonstrating its current usage and submitting status and title copies of its registrations, and National Pork Producers Council [NPPC] by its demonstrated use over a long period of years, its status as an entity having privity with NPB as one of NPB's licensees, and as an

entity retaining an economic and contingent interest in the mark.

## *Do commodity promotional slogans function as source indicators?*

Applicant takes aim directly at commodity promotional slogans generally, and opposer's slogan **THE OTHER WHITE MEAT** in particular, arguing that they function merely as "generic labels" or "marketing campaigns."[24]  As noted above, the involved mark is a slogan designed to promote the consumption of pork and pork products in the United States.  While the direct beneficiaries of a successful demand enhancement campaign may well be pork producers and packers and associated businesses in the chain of production and marketing, the target audience for the advertising is undoubtedly members of the general consuming public.  However, this is certainly not an issue unique to opposers, the pork industry, or this slogan:

> Pork joined a lengthening list of commodities being promoted with funds collected from farmers who pay mandatory assessments. The trend reflects a growing awareness in the Farm Belt that generic products must be marketed as aggressively as brand-name products in today's highly competitive marketplace.[25]

---

[24]    To the extent applicant's argument that commodity promotional slogans, in general, do not function as marks, is intended to be an attack on opposers' registered slogan mark specifically, it is an impermissible attack on the validity of opposers' registrations which will not be entertained in the absence of a counterclaim for cancellation.

[25]    *Wall Street Journal*, September 28, 1988, N of R, #33, p.83.

Indeed, the record shows that opposers' **THE OTHER WHITE MEAT** mark is one of many such promotional slogans owned by commodity promotion agencies regulated by the USDA and funded with mandatory "checkoff" revenues collected from sales of the promoted commodity. Opposers have placed at least seventeen third-party registrations into the record, of which the following are merely representative examples:

| | |
|---|---|
| **BEEF. IT'S WHAT'S FOR DINNER.** | for, *inter alia*, "promoting the interests of the beef and beef products industry by disseminating advertising and promotional materials and consumer and industry information about beef and beef products" in Int. Cl. 35;[26] |
| **THE FABRIC OF OUR LIVES** | for, *inter alia*, "promoting the consumption of cotton and products made from cotton and the interest of the United States cotton producers and importers by means of printed material, radio and television; and providing technical consultation to cotton mills and manufacturing of cotton products; and carrying out research for others to improve cotton products and the manufacture of cotton products" in Int.Cl. 42;[27] |
| **THE INCREDIBLE EDIBLE EGG** | for "promoting awareness of the benefits of eggs" in International Class 42;[28] |

---

[26] Registration No. 1809825 issued to The Cattlemen's Beef Promotion and Research Board (United States Statutory Board), AKA Cattlemen's Beef Board and AKA Beef Board on December 7, 1993; renewed. No claim is made to the right to use the word "Beef" apart from the mark as shown.

[27] Registration No. 2144788 issued to Cotton Incorporated on March 17, 1998; renewed.

[28] Registration No. 2442449 issued to The American Egg Board (United States Government Agency) on April 10, 2001;

Opposers argue that these marks and other like them:

> " … function in precisely the same way as NPB's mark, as a slogan to promote the interests of an entire industry through marketing aimed at promoting the consumption of that industry's principal product, whether it be fresh beef, cotton fabric, or whole eggs.  These slogans pervade the marketplace.  The marks are instantly recognizable, and their iconic impact aims to promote not a particular brand of goods, but rather a service to that commodity industry as a whole, promoting consumption of that industry's principal product.  With the breadth of such commodity promotional slogans in the marketplace, there can be no question that consumers recognize these slogans for what they are, marks designating the promotion of an industry group as a whole.  As such, these slogans function quintessentially as trademarks."

Opposers' reply brief at 13.

However, applicant argues that consumers will be misled and deceived by commodity promotion slogans, and that all such agencies should be scrutinized because of their inability to control the quality standards of the commodity being sold.  Applicant seems to call into question whether such slogans should even be protected in the U.S. as source indicators under the Lanham Act – a contention clearly beyond the scope of this proceeding.

---

Section 8 affidavit (six-year) accepted and Section 15 affidavit acknowledged.  No claim is made to the right to use the word "Egg" apart from the mark as shown.

Applicant's attack on opposers' commodity promotion slogan seems to misapprehend the quality control responsibilities of opposers and similar trade associations. NPB owns federal registrations for association services namely, promoting the interests of members of the pork industry. Hence, NPB's service marks serve to distinguish the service of promoting the pork industry. This is not a *certification mark* certifying that pork products meet certain quality standards.[29] Additionally, this is not a *product mark* for identifying a brand of pork. Clearly, the owner of a product mark for fresh pork who does not control the quality of a licensee's products risks a finding that its trademark has been abandoned.

By contrast, the owner of a commodity promotion slogan is concerned with the marketing effectiveness of all the producers, suppliers and vendors within its industry sector as a whole, whatever the principal product may be. Opposers herein maintain a precise message and focus by controlling the ways in which their slogan/mark is used on

---

[29]   *Contra Midwest Plastic Fabricators Inc. v. Underwriters Laboratories Inc.,* 906 F.2d 1568, 15 USPQ2d 1359 (Fed. Cir. 1990) [Underwriters Laboratories certifies with its well known symbol that electrical equipment meets safety standards]; *In re Celanese Corp. of America,* 136 USPQ 86 (TTAB 1962) [**CELANESE** certifies plastic toys meeting certifier's safety standards].

the promotion and packaging of pork and pork products.  The ultimate measure of this effort is the level of pork consumption in the United States as a share of all meat products, ultimately translating into economic benefit for all pork producers.  However, unlike the individual enterprise within the pork industry, opposers are not attempting to distinguish source among various retail vendors.  [Meimann at 155-158]  As opposers point out in their reply brief, this involves a "slogan that distinguishes a promotional campaign for fresh pork, a promotional campaign [U.S. consumers] have seen for … a generation and which has become part of the fabric of popular culture in America."  Reply Brief at 4.  These commodity promotion slogans are instantly recognizable and have had a pervasive impact on the consumer marketplace and in popular culture.  As seen above from the federal trademark register, many have long been similarly-funded through congressionally approved marketing programs.

However, applicant argues that "where a term is widely adopted within an industry, it lessens the ability for any party to claim trademark rights in the term."  This case does not, however, involve a term widely used as descriptive or generic.

Applicant's confusion may be prompted by the fact that this demand-enhancing, promotional activity is sometimes labeled "generic advertising." As noted earlier, these messages are producer-funded efforts to enhance the demand for farm commodities. As opposed to advertising for specific brands of a product by particular producers, this "generic advertising" is a cooperative group effort by the suppliers to promote demand for a particular generic product, not a product of a particular producer. A "generic" ad slogan shared by all those in the same industry (e.g., **PORK. THE OTHER WHITE MEAT**) focuses on difficult-to-determine attributes *common* to this commodity group (e.g., the nutritional content of pork)[30] The slogan's use is managed by a commodity promotion board (whether established by federal statute or organized voluntarily by the industry) and has value for all the producers or suppliers in that particular industry, presumably at the expense of competing categories of products (e.g., chicken). Within the pork industry, this effort is clearly brand-neutral.

---

[30]   It is black letter trademark law that traditional, branded messages by individual trademark owners are adopted and used to *differentiate* between or among products within the commodity group, rather than to highlight their similarities.

Accordingly, that the primary focus of such an association's endeavor is national advertising designed to promote the consumption of a particular commodity does not disqualify the mark or slogan under the Lanham Act's statutory definition of a mark.  Indeed, this record shows that industry slogans like "Got Milk?" "The Other White Meat," "The Fabric of Our Lives," and "Beef. It's What's for Dinner" function as quintessential association source-indicators.

### **PORK.  THE OTHER WHITE MEAT** or just **THE OTHER WHITE MEAT**?

As to exactly what comprises opposers' mark, opposers in this litigation have claimed rights in the slogan, **THE OTHER WHITE MEAT**.  However, applicant claims that the mark, as actually used, is the longer slogan, **PORK. THE OTHER WHITE MEAT.**

As noted above, the three federal trademark registrations claimed by opposers include the words **THE OTHER WHITE MEAT** only.  To the extent that applicant is arguing that opposers use the longer slogan, **PORK. THE OTHER WHITE MEAT**, and hence, cannot rely on these registrations, we find this to be an impermissible attack on the validity of opposers' registrations absent compulsory counterclaims.

As to the manner in which opposers have deployed the slogan, the record shows extensive usage of both "The Other White Meat" and "Pork. The Other White Meat." Under examination policies of the United States Patent and Trademark Office, if using the variety of available images (i.e., those captured for the prosecution of this opposition) as specimens of actual usage of the slogan, opposers *qua* applicants would be given the latitude to choose either or both of these slogans for registration, so long as the mark selected, as depicted on the specimens of use, creates an independent commercial impression.

### ***Dilution by blurring***

When an application to register a mark is challenged on grounds of dilution under Section 43(c) of the Act, 15 U.S.C. § 1125(c),[31] we look to three elements: (1)

---

[31] **(c) Dilution by blurring; dilution by tarnishment**
    **(1)** Injunctive relief -- Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.
    **(2)** Definitions
        **(A)** For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite

whether the opposer's mark is famous; (2) whether the

opposer's mark became famous prior to the date of the

application to register the applicant's mark; and (3)

whether the applicant's mark is likely to blur the

distinctiveness of the opposer's famous mark.

---

degree of recognition, the court may consider all relevant factors, including the following:

**(i)** The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
**(ii)** The amount, volume, and geographic extent of sales of goods or services offered under the mark.
**(iii)** The extent of actual recognition of the mark.
**(iv)** Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

**(B)** For purposes of paragraph (1), "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

**(i)** The degree of similarity between the mark or trade name and the famous mark.
**(ii)** The degree of inherent or acquired distinctiveness of the famous mark.
**(iii)** The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
**(iv)** The degree of recognition of the famous mark.
**(v)** Whether the user of the mark or trade name intended to create an association with the famous mark.
**(vi)** Any actual association between the mark or trade name and the famous mark.

---

**A.   Is the term THE OTHER WHITE MEAT famous?**

---

Unlike the typical product mark, the slogan here is for an industry-wide, commodity-promotion marketing campaign.  While it does sell some collateral merchandise, NPB does not itself sell pork using the **THE OTHER WHITE MEAT** mark.  Nonetheless, given the nature of this mark, there is no doubt but that the pork products promoted by the slogan make up a meaningful portion of the quantity of meat sold in the U.S.  [Ex. 18 at Bates No. NPB3606, NPB3609 (showing USDA consumption data for pork)]

In spite of this voluminous record, applicant argues that opposers have presented only "imprecise statements regarding advertising expenditures" rather than substantiated evidence of actual advertising expenditures.

However, the record is clear that NPPC, NPB and various state pork producer associations have spent more than $550 million dollars in Pork Checkoff funds on demand enhancement promotional activities over the more than twenty-year life of the mark, and that those dollars were spent on advertising and marketing activities that used the mark **THE OTHER WHITE MEAT**.  [Williams-III at 274-275; Meimann at 66-67]  In some instances, other marks and taglines were included, but every visual included in this

extensive record shows that **THE OTHER WHITE MEAT** was the central focus of the advertising campaigns, not simply "wallpaper." The preponderance of the evidence in the record establishes that NPB's direct demand-enhancement campaign has expended, on average, more than $25 million per year during its lifetime [Williams-II at 184; Ex. 298], not the lesser level of five million dollars alleged by applicant. On this point, we are not convinced that Dr. Steven Meyer has expertise or training in the valuation of marks, and there is no corroboration in the record to support his report of the precipitous decline within a mere two years (from his report of 2001 to his report of 2003) in annual media expenditures for demand enhancement derived from Pork Checkoff monies from $25 million down to $5 million. This raises questions about the reliability of the latter estimate.

Separate from these total Pork Checkoff funds invested in the mark, substantial third-party advertising of the mark has taken place through cross-promotional and co-branded activities. [Exs. 135, 136, 138, 139, 140, 141, 142, 147, 151, 212, 219, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 247, 252, 255, 276]

In characterizing opposers' promotional efforts as insufficient (e.g., by contrasting such efforts with those

involving **JUST DO IT** (Nike) or the slogan **DON'T LEAVE HOME WITHOUT IT** (American Express)), applicant alleges that " … neither the NPPC nor the NPB has made any showing of the advertising of their association services." However, opposers' association services are "promoting the interests of members of the pork industry." And we find that substantially all of opposers' demand enhancement activities were designed and functioned to promote the interests of members of the pork industry. This is, indeed, opposers' exact recitation of services. It is certainly not critical in this context whether consumers can name NPPC or name NPB. Consumers need not identify the source of the services. Rather, for the mark to be source-identifying, it is sufficient that consumers associate the mark with a single, albeit anonymous source. *Ralston Purina Co. v. Thomas J. Lipton, Inc*., 341 F.Supp. 129, 173 USPQ 820, 823 (S.D.N.Y. 1972); 2 J. Thomas McCarthy, *MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION*, §15:8 (4th ed. 2010).

NPB's non-litigation consumer surveys – ranging from periodic tracking studies to the Northwestern Study of 2000 – demonstrate a high degree of consumer and general public recognition of the mark. Tracking studies consistently have shown consumer recognition of the mark above the eighty-five percent level. [Ex. 77 at Bates No. NPB67080]

Similarly, the Northwestern Study during the year 2000 showed nearly eighty percent awareness of the mark among the general adult population at that time. [Groenstedt at 53-54] These researchers found that in terms of correct attribution between the slogan and the source, only four nationally known slogans ranked higher than **THE OTHER WHITE MEAT** [Ex. 338] Opposers point out that this means it was ranked higher than other well-known slogans such as **JUST DO IT**[32] (Nike), **DON'T LEAVE HOME WITHOUT IT**[33] (American Express), **KING OF BEERS**[34] (Budweiser) and **LIKE A GOOD NEIGHBOR** (State Farm). [Groenstedt at 20, 39-50; Ex. 338]

The study was subsequently reported on by various news media, which mentioned the position of the mark **THE OTHER WHITE MEAT** as the fifth most recognized advertising slogan in the United States among the general adult population at that time. [Exs. 268, DVD No. 1; First Notice of Reliance, Ex. 4] As Dr. Anders Groenstedt, the principal

---

[32] *Nike, Inc. v. Circle Group Internet, Inc.*, 318 F. Supp. 2d 688, 692, 70 USPQ2d 1853, 1856 (N.D. Ill. 2004) [finding **JUST DO IT** (twelfth in Northwestern Study) to be famous].

[33] *American Express Co. v. CFK, Inc.*, 947 F.Supp. 310, 312, 41 USPQ2d 1756, 1757 (E.D. Mich. 1996) [finding **DON'T LEAVE HOME WITHOUT IT** (seventeenth in Northwestern Study) to be famous].

[34] *Anheuser-Busch Inc. v. Goldstein*, Opp. No. 106963, slip op. (TTAB Mar. 30, 2000) (non-precedential) [finding **KING OF BEERS** (eighth in Northwestern Study) to be famous].

investigator for the Northwestern Study, testified at trial, "We were blown away by the high recognition." [Groenstedt at 50]

Additionally, the record shows extensive references to the mark in the popular culture. The mark has made appearances on late night television shows [Williams-I at 43-45; Williams-II at 159; Exs. 202, 203, 268], game shows [Williams-II at 159; Exs. 206, 268], nationally syndicated comic strips [Williams-I at 45; Ex. 204], Hollywood box-office hits and as a variety of other references in the popular culture [Williams-I at 55; Williams-II at 159]. Opposers argue that these cultural references are probative because they would not be so wide-spread if this slogan were not so famous to a substantial portion of the population.

Furthermore, the mark has been discussed in third-party publications [Ex. 167], college textbooks on advertising and marketing [Williams-I at 170-172], as a Harvard Business School Case Study [Ex. 65], and in news reports in the nation's leading printed publications. [*See* NPB's First Notice of Reliance, Exs. 1-52; *see also* Williams-I at 48-54; Ex. 209] The mark regularly shows up in published lists of famous marks [NPB's Second Notice of Reliance, Exs. 1-7], and is used as the instructional

example by the Thomson Company on how to construct a trademark search for advertising slogans in the Thomson-Dialog database. [Williams-II at 172-174; Ex. 273]

Mr. Williams testified that in light of the "phenomenal" degree of consumer recognition of the mark, the renown of this remarkable slogan makes it one of the most well-known and successful advertising slogans in modern times. [Williams-II at 181-186, 212] That this mark is extremely well-known is corroborated by the other marketing and advertising professionals who testified at trial. [Groenstedt at 19-20; Hockman at 94-95; Hartz at 80-81; Snyder at 44-46; Sutton at 79-81; Meimann at 108]

Accordingly, we find that the evidence demonstrates that **THE OTHER WHITE MEAT** is famous. It is among the most well-known advertising slogans in the U.S. given awareness rates at eighty to eighty-five percent of the general adult population and rates of correct source recognition at nearly seventy percent of the population. [Groenstedt at 53-54; Ex. 338] Awareness and recognition at this level has certainly supported a finding of fame in those rare instances where this Board has found a likelihood of dilution. *See 7-Eleven Inc. v. Wechler*, 83 USPQ2d 1715, 1727-28 (TTAB 2007) [fame for dilution purposes with survey showing awareness among seventy-three percent of general

consumers]; and *Nasdaq Stock Market Inc. v. Antartica S.r.l.,* 69 USPQ2d 1718, 1737 (TTAB 2003) [fame for dilution purposes with survey showing awareness of the mark among eighty percent of investors]. We find, based upon the preponderance of the evidence, that NPB spent in the neighborhood of $25 million every year for almost twenty years on demand enhancement advertising and marketing prior to the filing of the involved application. Additionally, the record shows an extensive amount of third-party advertising, in-store retail promotions, and unsolicited, national news media coverage. All of this evidence taken together supports the conclusion that opposers' mark **THE OTHER WHITE MEAT** is famous among a broad spectrum of the general consuming public.

B. Was the mark **THE OTHER WHITE MEAT** famous before applicant's filing date?

The majority of the evidence in the record about the renown of opposers' slogan predates the involved application filing date of February 4, 2004. Therefore, we find that the fame of **THE OTHER WHITE MEAT** was well-established prior to the date that Supreme Lobster and Seafood Company filed the involved application.

> C. Is applicant's mark **THE OTHER RED MEAT** likely to blur the distinctiveness of the opposer's mark, **THE OTHER WHITE MEAT**?

Dilution by blurring is an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. Over time, the gradual whittling away of distinctiveness will cause the trademark holder to suffer "death by a thousand cuts."[35] Accordingly, we consider the statutory, non-exclusive factors for determining the likelihood of blurring in a dilution case set out by the Trademark Dilution Revision Act, 15 U.S.C. § 1125(c)(2)(B):

### *The degree of similarity between the mark or trade name and the famous mark.*

When making a determination under the Trademark Dilution Revision Act of 2005 (TDRA), after finding in the affirmative on the question of pre-existing fame, an important question in a dilution case is whether the two involved marks are sufficiently similar to trigger consumers to conjure up a famous mark when confronted with the second mark. For purposes of this element, we find

---

[35] *See* Barton Beebe, "*A Defense of the New Federal Trademark Antidilution Law,*" 16 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 1143, 1163 (2006).

that the two marks involved herein are highly similar, having the same structure and cadence and three of the same words.  The difference involves only the third of the four words, which in both cases is an adjective referring to a color of meat, of which there are precious few from which to choose.  Both slogans elicit the same mental processing, namely, a comparison of the promoted meat with another kind of meat.  Indeed, Mr. Klein's dilution survey shows that more than thirty-five percent of the survey respondents associate applicant's slogan with opposers' slogan (or with the pork being promoted by the mark) in an unaided survey response.  [Klein at 72; Ex. 317]  This degree of association demonstrates that a sizeable segment of the target population sees the two marks as highly similar.

Accordingly, under these circumstances, we find that this statutory factor weighs in favor of a finding of likelihood of dilution.

### *The degree of distinctiveness of the famous mark.*

Even though inherent distinctiveness is not required, the statute is weighted toward a finding of dilution when the famous mark in question is commercially-strong and inherently distinctive.  *See Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 84 USPQ2d 1865, 1876 (9th Cir. 2007).

- 54 -

Opposers' mark, **THE OTHER WHITE MEAT** is entitled to a presumption of inherent distinctiveness. The incontestable registration issued based upon a claim of use in commerce without a Section 2(f) showing of acquired distinctiveness. *See Tea Bd. of India v. Republic of Tea, Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006). In truth, the service mark slogan, **THE OTHER WHITE MEAT**, only suggests a healthy attribute of the commodity being promoted by the pork industry, namely, the color of some cuts of pork after being cooked. *See In re MBNA Am. Bank, NA*, 340 F.3d 1328 67 USPQ 2d 1778, 1779-80 (Fed. Cir. 2003).

Thus, we find that the suggestive mark, **THE OTHER WHITE MEAT,** is inherently distinctive, and consideration of this element also suggests that dilution by blurring is likely.

### *The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.*

The record herein shows that opposers' use of the mark **THE OTHER WHITE MEAT** is virtually exclusive. There is no evidence of any actual use in commerce, at the time applicant filed its application for a federal trademark registration or since then, of the same or similar marks, on any goods or services, to say nothing of goods or services that are related to either the promotion of the pork industry or the sale of salmon products. Accordingly,

opposers' exclusivity of use of this mark also supports the conclusion that dilution by blurring is likely.

### *The degree of recognition of the famous mark.*

The fourth listed statutory factor for the blurring analysis has us assessing just how well recognized is opposers' mark. The evidence opposers have placed into this record is voluminous. The preponderance of this evidence convinces us that this slogan, **THE OTHER WHITE MEAT**, has become part of the fabric of popular culture in the United States. We find especially compelling the evidence from the Northwestern Study of 2000 showing that only four other consumer slogans in the United States had a greater degree of recognition than **THE OTHER WHITE MEAT**. [Ex. 338] This finding supports a conclusion that opposers' mark is extremely well recognized by a broad spectrum of consumers, and that this degree of recognition among the general consuming public of this famous mark also supports the conclusion that dilution by blurring is likely upon the introduction of applicant's slogan into the marketplace.

### *Whether the user of the mark or trade name intended to create an association with the famous mark.*

The evidence shows that applicant's CEO, Dominic Stramaglia was aware of the opposers' mark. [Stramaglia at

22, 26]  He also reviewed a Thomson & Thomson trademark search report showing the mark, **THE OTHER WHITE MEAT**, as the third cited reference among potentially conflicting marks at the time applicant filed its intent-to-use application.  [Stramaglia at 22, 36-39, 43; Ex. 272]  Mr. Stramaglia's assertion that he came up with the slogan **THE OTHER RED MEAT** "out of the blue" and without any thought of opposers' well-known slogan stretches credulity.  Mr. Stramaglia admitted to having customer relationships with well-publicized restaurants in the Chicago area that prominently participated in opposers' **THE OTHER WHITE MEAT** campaign.  [Stramaglia at 15; Williams-I at 69-71; Cizek at 27-28; Ex. 254]  In directing its demand enhancement efforts, opposers have always placed great importance on the Chicago region.  [Williams-I at 56-58, 72- 73; Hockman at 29-30]  Judging by the fact that ninety-one percent of consumers in the Chicago market were then aware of opposers' slogan, Mr. Stramaglia would be in a distinct minority of the uninformed on this agricultural commodity slogan despite his close and long-standing involvement in the food industry in general and the Chicago market in particular.  [Ex. 79]  Moreover, he said that he conceived of **THE OTHER RED MEAT** as a trademark that would highlight

- 57 -

the healthy and nutritious features of salmon.  [Stramaglia at 33—34]  If this is in fact the connotation that applicant intended for its mark, we find it telling that this is the same connotation (with respect to pork) underlying opposers' slogan and expensive demand enhancement efforts.  In that case, this explanation further supports a finding under this dilution factor that applicant was intending to "create an association with the famous mark."

While we are reluctant to conclude bad faith on the part of applicant, we find that applicant's principals may have believed it was permissible for applicant to create such an association, and hence, consistent with a likelihood of dilution by blurring, resolve this factor in opposers' favor.

### *Any actual association between the mark or trade name and the famous mark.*

In a situation like this where applicant has filed an intent-to-use application and has to date not engaged in any actual use of the junior mark, it is impossible to present any evidence of actual association between the marks in the marketplace.  Accordingly, it seems that this

statutory factor too is neutral but consistent with a likelihood of dilution by blurring.[36]

Accordingly, after considering all the relevant factors, we find herein a likelihood of dilution by blurring.

### *Likelihood of Confusion*

Because we have found for opposer in connection with its likelihood of dilution claim, we do not reach its claim of likelihood of confusion.

*Decision:* The opposition on the ground of likelihood of dilution is sustained and registration to applicant of its **THE OTHER RED MEAT** mark is hereby refused.

---

[36] Opposers argue that Mr. Klein's litigation survey provides a probative substitute for what is likely to occur in the marketplace were applicant to use its intended mark. As noted earlier, this survey shows that for thirty-five percent of the survey respondents, applicant's slogan **THE OTHER RED MEAT** calls to mind either opposers' actual slogan or the pork products the slogan promotes. [Klein at 72; Ex. 317; Williams-III at 282] While opposers are correct that this survey evidence suggests that a high degree of association is likely (i.e., that more than a third of the respondents associated applicant's slogan with opposers' slogan), we cannot logically draw from this compelling survey result any conclusions about "actual association."